[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12098
Non-Argument Calendar
_____

D.C. Docket No. 2:10-cv-14244-JEM

ELISAMES HARRIS,

Plaintiff-Appellant,

versus

DOUGLAS LEDER, D.O.,
Ophthalmologist,
FLORIDA DEPARTMENT OF INSURANCE,
Division of Risk Management,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 24, 2013)

Before CARNES, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Elisames Harris, a state prisoner, appeals pro se the grant of summary judgment in favor of Defendant-Appellee Dr. Douglas Leder.  Harris brought this 42 U.S.C. § 1983 action alleging that Dr. Leder, acting under color of state law, was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment.  After some discovery, the district court granted Dr. Leder's motion for summary judgment.  After review, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

We first set forth the facts taken from various affidavits and Plaintiff Harris's medical, hospital, and prison records submitted by the parties.  We consider the facts and draw all reasonable inferences in the light most favorable to Harris, as the non-moving party.  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).

### A.     August 5, 2007 Injury and Hospital Treatment

In 2007, Plaintiff Harris was a state prisoner incarcerated at the Martin Correctional Institution ("MCI") in Indiantown, Florida. On August 5, 2007, Harris injured his right eye while playing flag football at MCI.  The MCI medical staff examined Harris's eye and transported him to St. Mary's Hospital ("St. Mary's) for further examination and treatment.

At St. Mary's, Defendant Dr. Leder, a board-certified ophthalmologist, was the emergency, on-call doctor and examined Harris.  Dr. Leder diagnosed a

2

cataract in Harris's right eye from trauma and "20/400" vision.  Harris averred that "[d]uring this time [he] had no vision."

In the medical records, Dr. Leder noted that Harris already had a "dislocated lens" in his left eye due to previous trauma, which the records described in another place as "(L) eye had retinal detach [and] has no vision" in left eye.  Harris does not dispute that he had a prior retinal detachment in his left eye and has no vision in that eye.

Dr. Leder advised Harris to return for a follow-up evaluation within two to three days and then to undergo cataract surgery on his right eye.

## B.    August 7, 2007 Follow-up Examination

Two days later, on August 7, 2007, Dr. Leder again examined Harris.  In the medical records, Dr. Leder noted that he told Harris that he either (1) could perform "traditional cataract surgery" on Harris's right eye, which would involve replacing the lens, or (2) he could "leave [the] eye as is."  Similarly, Harris's affidavit stated that "Dr. Leder stated that he had a choice to either do the cataract surgery with the lens implant replacement or leave the right eye as it was."  Harris instructed Dr. Leder to perform the surgery.

During the August 7 office visit, Dr. Leder discussed with Harris the specific risks associated with surgery, including:  "infection, retinal detach[ment], blindness, glaucoma, 2nd surg[ery]."  Harris signed a consent form, dated August

7, 2007, authorizing "cataract removal [right] eye, with iol implant."[1]  Harris's

consent form also contained an acknowledgement about risks of the surgery

stating:

> I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantee or assurance has been made as to the result that may be obtained.  The nature and purpose of the above procedure, possible alternative methods of treatment (observation, mydriatics), the risk involved and the possibility of complications including but not limited to infection, hemorrhage, inflammation, need for Yag laser, pain, glaucoma, non-healing, blindness or loss of eye, loss of corneal clarity, diplopia (double vision), pupil abnormalities, breakage of capsule, loss of lens fragments, loss of vitreous, or retinal detachment, need for further surgery, have been fully explained to me by: Douglas R. Leder[,] DO.

## C.    September 11, 2007 Surgery on Right Eye

On September 11, 2007, Dr. Leder performed the surgery on Harris's right

eye and successfully removed a "[p]artially dislocated traumatic cataract."[2]

Harris's affidavit stated that, when he arrived for the surgery, he "informed Dr.

Leder that [his] vision in [his] right eye had started to return.  Dr. Leder assured

[him] that the surgery was needed to replace the damaged lens."

Dr. Leder, however, did not insert a lens implant on Harris's right eye, as he

had intended.  Dr. Leder's affidavit explained that he "did not replace the right lens

due to the severity of ocular damage in . . . Harris'[s] right eye as well as the risk

---

[1]It is not disputed that "iol implant" means intraocular lens implant.

[2]In his complaint, Harris alleged that Dr. Leder performed the surgery on September 10, 2007.  However, Harris's medical records show that the surgery actually occurred on September 11, 2007.

4

for future complications." Dr. Leder noted that his medical judgment was based not only on the "traumatized right eye" but also on the fact that "Harris had lost vision in his left eye from previous trauma and lens dislocation." Dr. Leder added that he "prescribed prescription safety glasses for . . . Harris, which if used, would correct the vision to his right eye and would provide some physical protection for his solely functioning right eye given his current environment."

Similarly, in a written report prepared immediately after the surgery, Dr. Leder explained why it was not safe to implant a lens in the right eye:

> [i]t was apparent that it would not be safe to put in the intraocular lens at this time and due to the patient having had problems with his left eye and being blind in his left eye from the trauma six years ago, it appeared to be safer to not put in an anterior chamber lens, since the patient could be subjected to future trauma in the right eye. It was felt that at this point, either the patient would be best rehabilitated with either a contact or even a pair of glasses with safety glass to protect the right eye from the future possibility of trauma.

In his affidavit, Harris averred that Dr. Leder never informed him that he did not replace the lens in his right eye during the surgery.

## D.    September 26, 2007 Post-Surgical Follow-Up Examination

On September 26, 2007, Dr. Leder performed a routine follow-up examination of Harris's right eye. Dr. Leder's contemporaneous report stated that he: (1) found that Harris had 20/40+ vision in his right eye with +10 correction; and (2) wrote Harris a prescription for polycarbonate safety lenses.

5

In his affidavit, Harris contested these facts, stating that: (1) "[d]uring this time, [he] had no vision"; and (2) "Dr. Leder did not prescribe those glasses to . . . Harris as he claimed."

In any event, a Florida Department of Corrections document, submitted by Harris, indicates that Harris actually received prescription eye glasses on February 6, 2008. The eye glasses: (1) were bifocal type "FT28"; (2) had "distance" spheres of +0.50 for the right eye and "Balance" for the left eye; (3) had "add" spheres of +2.50 for both eyes; (4) had cylinders of -0.50 for the right eye and "Balance" for the left eye; and (5) had an axis of 180. Harris's prescription form for these glasses included the following special instruction: "Tint Grey solid #2."

## E.    December 5, 2007 Examination

On December 5, 2007, Dr. Patrick Brennan, a doctor at the prison, examined Harris's eyes. The prison medical records from this examination indicate that Harris told Dr. Brennan that his "VA in OD is worse after cat[aract] sx on 9/11/07." Dr. Brennan noted that Harris met "DOC criteria for contact lens," and that "glasses [were] already ordered."

In his affidavit, Harris stated it was not until this appointment with Dr. Brennan that he learned that Dr. Leder had not implanted a lens in his right eye. According to Harris, Dr. Brennan informed him that "no future surgery can be

performed." Harris further stated that "the missing lens in the right eye . . . is the reason for [his] blindness."

## F.    Prison Administrative Grievances About Right Lens Implant

On January 30, 2008, Harris filed an "informal grievance" stating he was promised a lens replacement in his right eye and had not received one. Harris stated: "[i]t ha[s] been '5 months' and my vision [has not] returned." Subsequently, Dr. Fernando Caravallo, at the prison, replied, "you were treated about your eye injury by a professional and you have been approved for new glasses on 02/06/07."

On February 13, 2008, Harris filed a "Request for Administrative Remedy or Appeal" with the MCI warden. In his grievance form, Harris stated that "Dr. Leder assured [him] . . . that [he] would receive [a lens implant] during the operation. Yet [he] wasn't giv[en] it." On February 27, 2008, Dr. Caravallo, Dr. Sanchez, and the assistant warden signed the denial of Harris's request, giving this reason: "You have been done with eye surgery since 09/2007. You have to be provided with glasses as recommended by the eye surgeon. You are soon to be seen by the optometrist again for a Follow up evaluation."

On March 7, 2008, Harris appealed the denial of his grievance to the Secretary of the Florida Department of Corrections. In his appeal form, Harris

7

repeated his allegations regarding the lens implant in his right eye.  On May 12, 2008, Harris's appeal was denied.

On May 14, 2008, Harris filed a "Reasonable Modification or Accommodation Request" form with the MCI warden.  Harris requested that he be allowed to sleep on a lower bunk as he was "legally blind in both eyes."  An MCI form, dated May 19, 2008, indicated that Harris's request for a tape recorder was granted because of "lack of sight for reading."

## G.    State Court Complaint

Harris then filed a complaint in state court against Dr. Leder, the MCI assistant warden, and four MCI physicians, asserting claims for medical malpractice and fraud.  On March 18, 2010, the state court dismissed Harris's complaint after determining that Harris had not complied with the statutory prerequisites for bringing a medical malpractice claim and had failed to state a claim for fraud.

## H.    Federal § 1983 Complaint and Discovery

On September 16, 2010, Harris filed his federal § 1983 complaint against Dr. Leder, asserting that Dr. Leder's "intentional failure to replace . . . Harris'[s] lens [in] his right eye . . . constitute[d] deliberate indifference to [Harris's] serious

medical needs in violation of the Eighth Amendment."[3]  The district court denied

Dr. Leder's motion to dismiss for failure to state a claim, and the parties engaged

in some discovery.

During discovery, Dr. Leder filed an expert affidavit of Dr. Clifford

Salinger, a board-certified ophthalmologist licensed in Florida.  Dr. Salinger

reviewed: (1) Harris's state court filings; (2) Harris's § 1983 complaint and the

attached documents; (3) Harris's medical records prepared by Dr. Leder; and (4)

other medical records pertaining to Harris's treatment at St. Mary's.

Based on this review, Dr. Salinger opined "that the care rendered by Dr.

Leder was commensurate with that level of care, skill, and treatment recognized by

reasonably prudent, similar healthcare providers as acceptable and appropriate

under the same or similar conditions and circumstances."  Dr. Salinger explained

that Dr. Leder exercised sound medical and professional judgment in not

implanting a lens in Harris right eye:

> the decisions made by Dr. Leder, during surgery . . . did not constitute
> a deliberate indifference to . . . Harris'[s] medical needs, but rather,
> demonstrated an exercise of professional judgment based upon
> discoveries made during surgery and upon . . . Harris'[s] anatomy,
> which were intended to preserve . . . Harris'[s] right eye.  Given the
> circumstances, that . . . Harris had already lost vision in his left eye
> due to unrelated events, Dr. Leder exercised sound medical judgment

---

[3]Harris's § 1983 complaint also named the Florida Department of Insurance as a defendant.  Service was never made and the complaint did not contain any claim or allegation pertaining to this defendant.  Accordingly, the district court dismissed the Florida Department of Insurance from the case.  Harris does not appeal this dismissal.

not to replace the lens in the right eye which, based upon . . . Harris'[s] anatomy, would have left him at higher risk for more serious complications.

Dr. Salinger concluded that Harris's injuries were not permanent. Rather, "[t]he serious medical need of which . . . Harris complains [could] be ameliorated via alternatives that [were] available to . . . Harris."

## I.    Summary Judgment

On June 9, 2011, Dr. Leder filed a motion for summary judgment, asserting the undisputed facts established that he: (1) was not a state actor when he treated Harris; and (2) did not act with deliberate indifference to Harris's serious medical needs.

On December 21, 2011, a magistrate judge issued a report recommending that the district court grant Dr. Leder's motion. The magistrate judge concluded that genuine issues of material fact existed as to whether Dr. Leder acted under color of state law when he treated Harris.[4] Summary judgment, however, was appropriate because Harris had failed to present evidence that Dr. Leder's treatment and decisions rose to the level of deliberate indifference to Harris's serious medical needs.

---

[4]Dr. Leder did not cross-appeal this ruling about his alleged state actor status. We also note that Harris argues that Dr. Leder submitted altered records from his August 7, 2007 office examination. The August 7 medical records submitted by Harris and those by Dr. Leder are the same as to Dr. Leder's diagnosis, treatment, and his notations. Any differences are minor and immaterial such as stamped addresses or business logos, and, in any event, are relevant only to the color of state law issue, which we need not address in this appeal.

The district court overruled Harris's objections, adopted the magistrate judge's report, and granted summary judgment to Dr. Leder.

## J.    Motions for Rehearing and Reconsideration

On February 7, 2012, Harris filed a "motion for rehearing," attaching a copy of a January 7, 2009 letter from an attorney to Harris.  Two days later, Harris filed a "motion for reconsideration."

On April 13, 2012, Harris filed a notice of appeal of the district court's summary judgment order.[5]  On June 1, 2012, the district court denied Harris's motions for rehearing and reconsideration. No other appeal followed.

## II.  DISCUSSION

## A.    Eighth Amendment Standard for Deliberate Indifference

"Federal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain," which is proscribed by the Eighth

---

[5]We review de novo the district court's grant of summary judgment. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).  Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

Amendment. Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976) (internal quotation marks omitted). [6]

To establish deliberate indifference to a serious medical need, an inmate must show: (1) "an objectively serious medical need" that, "if left unattended, poses a substantial risk of serious harm"; and (2) "that the response made by public officials to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal quotation marks and alterations omitted). Disagreement over a matter of medical judgment does not constitute cruel and unusual punishment. Estelle, 429 U.S. at 107, 97 S. Ct. at 293.

## B.    Harris's Claim of Deliberate Indifference

There is no dispute that Harris's traumatic injury to his right eye was an objectively serious medical need. Instead, the question here is whether Dr. Leder

---

[6]In his report, the magistrate judge noted that Harris was a pre-trial detainee and his § 1983 claim is thus based on the Fourteenth Amendment, not on the Eighth Amendment. Harris's affidavit, however, stated that he is a state prisoner. The official records of the Florida Department of Corrections state that Harris has been incarcerated continuously since February 25, 1991. See Florida Department of Corrections, Inmate Population Information Detail, Harris, Elisames, available at http://www.dc.state.fl.us/ActiveInmates/detail.asp?Bookmark=1&From=list&SessionID=954178 039 (last visited Apr. 26, 2013). Therefore, we analyze Harris's claim under the Eighth Amendment.

This distinction is largely a formality as the Eighth and Fourteenth Amendment standards for deliberate indifference to a prisoner's serious medical need are the same. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115 (11th Cir. 2005).

12

acted with deliberate indifference to Harris's serious medical need. For several reasons, we conclude that the record evidence does not create a factual issue as to deliberate indifference.[7]

First, the record affirmatively shows that Dr. Leder provided significant medical care to Harris. Specifically, Dr. Leder: (1) examined Harris's injury at the emergency room and made an accurate diagnosis; (2) examined Harris's injury a second time two days later, confirmed his diagnosis, and recommended treatment; (3) explained to Harris the various risks associated with surgery and his treatment; (4) removed the traumatic cataract in Harris's right eye; (5) made a medical decision, during the course of treatment and based on his professional judgment and all of the relevant circumstances, not to replace the lens in Harris's right eye; and (6) instead prescribed glasses to correct Harris's vision in his right eye and protect that eye in the future.

Second, in his affidavit, Dr. Leder explained that "[u]sing sound medical judgment," he decided not to "replace the right lens due to the severity of ocular damage in . . . Harris'[s] right eye as well as the risk for future complications." Dr. Leder also submitted the written expert opinion of Dr. Salinger, which described

---

[7]Harris's appellate briefs fail for the most part to set forth the evidence, much less tie it to his claims. But given his pro se status and even construing his appellate briefs liberally, we conclude Harris has not shown any reversible error.

Dr. Leder's decision as an exercise of "sound medical judgment" consistent with reasonably prudent medical care.

Third, to the extent that Harris asserts that Dr. Leder should also have provided him with additional treatment, specifically a lens replacement, "the question of whether governmental actors should have employed additional . . . forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting Estelle, 429 U.S. at 107, 97 S. Ct. at 293). And, importantly, for purposes of summary judgment and viewing the entire record in the light most favorable to Harris, we accept Harris's claim that he consented to cataract surgery with a lens implant and Dr. Leder did not provide the precise form of treatment that the parties discussed before the surgery. This fact, at best could support a claim for medical malpractice. But, "whether [Dr. Leder's] treatment might have constituted malpractice is not the focus of our inquiry here." Harris, 941 F.2d at 1507. It does not matter whether, before surgery, Dr. Leder intended to and agreed to replace the lens in Harris's right eye. What matters is whether Dr. Leder's ultimate decision not to replace the lens, whenever made, was based on sound medical judgment.

Viewed in a light most favorable to Harris, even if Dr. Leder's decision to forego the lens implant was inadequate, negligent, or actionable as malpractice

14

under state law, the fact remains that Dr. Leder made the decision based on his professional medical judgment and no evidence creates a fact issue of deliberate indifference by Dr. Leder.  Thus, we must affirm the grant of summary judgment in favor of Dr. Leder.[8]

**AFFIRMED.**

---

[8]We construe Harris's pro se submission of his tardy reply brief as a motion to file his reply brief out-of-time, and we grant this motion.  See Fed. R. App. P. 26(b).  Accordingly, we have considered the arguments presented in Harris's reply brief.